## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **CHAPTER 12** |
| **DALE EDWARD AKERS** | ) | |
| | ) | **CASE NO. 17-70584** |
| Debtor. | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on confirmation of the Fourth Amended Chapter 12

Plan (the "Fourth Amended Plan") (ECF No. 172) filed by the Debtor, Dale E. Akers (the

"Debtor"), and the objections thereto filed by Farm Credit of the Virginias, A.C.A. ("Farm

Credit") (ECF Nos. 40, 55, 86, 158, 177), Skyline National Bank ("Skyline") (ECF Nos. 41, 54,

178), and the Chapter 12 Trustee (the "Trustee") (ECF No. 38).  The Court held a hearing on

these matters on October 17, 2018, and has reviewed supplemental memoranda filed by the

Debtor (ECF No. 199), the Trustee (ECF No. 198), and Farm Credit (ECF No. 202).[1]

## FINDINGS OF FACT

At issue in this case are two farming operations in which the Debtor actively participates:

a produce farm operated by the Debtor, and a general partnership through which the Debtor and

his son Ryan Akers raise, buy and sell cattle.  The Debtor has financed his farming operations in

part through loans from Farm Service Agency ("FSA"), Skyline, and Farm Credit.  Those

creditors have filed secured claims in this case in the amounts of $97,572.61, $27,872.33, and

$227,658.36, respectively.  (Ct.'s Claims Reg., Proofs of Claim 2, 3, 5, 6, 7.)  Although the

---

[1] Although several of the parties reference the Debtor's Fifth Amended Plan (ECF No. 196) in their briefs, the Court has not granted leave to amend the Fourth Amended Plan and has not heard any evidence as to why the Fifth Amended Plan should be confirmed.  Accordingly, this Memorandum Opinion will focus on confirmation of the Debtor's Fourth Amended Plan and construe the Debtor's Fifth Amended Plan as a request for leave to amend the plan further.  *See infra* Conclusions of Law Part II (addressing leave to amend).

record does not provide an exhaustive background of facts leading to the Debtor's bankruptcy

filing, prior testimony from the Section 341 meetings indicates that his financial difficulties

stem, in part, from the payment of a son's substantial medical bills.  (Supp. to Trustee's Report,

ECF No. 38-1, at 1.)  The Debtor ultimately sought the protection of the Bankruptcy Code and

filed his Chapter 12 petition in this Court on May 3, 2017.

The Debtor filed his first Chapter 12 Plan on July 31, 2017 (ECF No. 24), to which Farm

Credit, Skyline, and the Trustee all objected.  (ECF Nos. 38, 40, 41.)  Each objected on multiple

grounds, including that the Debtor's financial records and projections did not support the plan's

feasibility.  In fact, by the September 20, 2017 hearing on plan confirmation, the Debtor still had

not filed any monthly operating reports.  By Order dated September 28, 2017, the Court denied

confirmation of the plan and provided fourteen days to file an amended plan, provide tax returns

to the objecting creditors, and file monthly operating reports.  (ECF No. 46.)  Since September

2017, the Debtor has filed five subsequent plans, none of which have yet been confirmed.  He

filed his Fifth Amended Plan shortly after the confirmation hearing on the Fourth Amended Plan

at issue here.

The Debtor has had numerous difficulties in putting forth a confirmable plan, most of his

own making.  A description of the Debtor's prior confirmation hearings is necessary to set the

background for evaluation of the Debtor's current plan.

I.        **The May 16, 2018 Confirmation Hearing**

On May 16, 2018, the Court held a hearing on the Debtor's Second Amended Chapter 12

Plan.[2]  A new objection to the Plan was filed by Farm Credit, and both Skyline's and the Chapter

---

[2] A first Amended Plan was filed October 4, 2017 and set for confirmation on November 15, 2017.  The Debtor, the
Chapter 12 Trustee, and the objecting parties all agreed that further amendment was necessary, and this agreement
led to filing of the Second Amended Plan.

12 Trustee's objections were carried over from the prior plan.  The objections focused primarily

on feasibility.  At the hearing it became readily apparent that the Debtor believed he owed

approximately $40,000.00 in delinquent real estate taxes to Carroll County, Virginia.  The

Debtor knew long before the confirmation hearing that he owed the taxes, and indicated his

counsel knew it as well.  However, Carroll County was neither disclosed as a creditor nor listed

on the mailing matrix as a creditor in the case.  Carroll County filed no proof of claim in the

case, and the Debtor's Chapter 12 plan made no provision for payment of the tax claim.  Despite

having no opportunity to be heard, when it became apparent the Chapter 12 Trustee and the

Court were concerned about the lack of disclosure and the failure to address the delinquent real

estate taxes, Debtor's counsel indicated the Debtor would simply agree to add language to the

confirmation Order requiring the Debtor to pay Carroll County in full within three years of

confirmation.  The Court was not persuaded that the Debtor could make the plan payments as

proposed in the plan, much less the plan payments plus the additional sum necessary to make the

tax payments to Carroll County.  In no event was the Court going to allow the Debtor to attempt

to bind Carroll County to the terms of a plan about which it had no notice or opportunity to be

heard.

Part of what concerned the Court is that the Debtor has a cattle business with his son,

Ryan.  Ryan pays all the bills in the cattle operation, and gives half the profit to the Debtor.

However, the Debtor was projecting $5,430.00 per month in revenue for January 2018 through

May 2018 from cattle sales as part of his budget in support of confirmation.  (ECF No. 123, Ex.

3).  However, the Debtor's monthly operating reports for January and February, the only ones

filed prior to May 2018, showed no income of any type for those months.  (ECF No. 123, Ex. 2).

The Debtor later testified that he has been paid about $14,000 year to date in cattle sales through

March and April, 2018.  The actual number was $17,874.49 in monthly operating reports filed

after the hearing.  (ECF Nos. 135, 136).  When asked by the Court how many cattle the Debtor

owned with his son, the Debtor did not know but estimated the number at about 100.  Again, a

post-hearing exhibit reflected the actual number to be 76 head of cattle.  (ECF No. 137).  The

Debtor had also borrowed and paid back money from his son post-petition to fund farm

operations, and the Debtor testified that he was putting money into his son's checking account—

and in at least one instance having a check written to Farm Credit off that account—to pay

operations of the Debtor's farm.  Given the Court's lack of confidence in the Debtor's financial

reporting, the lack of knowledge of the Debtor as to the cattle operation, the blurred lines

between the finances of the Debtor's son and those of his own, and the omission of the Carroll

County tax debt from the schedules and the Chapter 12 plan, the Court denied confirmation and

gave the Debtor thirty days to file a modified plan to come forth with better documented

financial projections, with amended schedules to address the Carroll County tax debt.  Given the

Debtor's borrowings from his son, the Debtor was also ordered not to incur any additional debt

without prior Court approval.[3]

## II.    The July 25, 2018 Confirmation Hearing

A Third Amended Plan was filed June 15, 2018 and set for hearing on July 25, 2018.

Farm Credit again objected to the Plan, and both Skyline's and the Chapter 12 Trustee's prior

objections were carried over as well.  The Debtor and his counsel met after the May 16, 2018

---

[3] A hearing was scheduled and held on June 20, 2018 on a motion to incur debt from the Debtor's son. Debtor's counsel represented to the Court the Motion was filed June 11, 2018, and that he was not expecting an objection. However, the motion was actually filed on Friday June 15, 2018, three business days before the hearing.  Farm Credit and the Chapter 12 Trustee objected to the motion, primarily because feasibility of the Debtor's plan was a continuing issue and no repayment terms for the proposed loan were described in the motion.  There were no exhibits filed in support of the motion, and when the matter was called on the docket, the Debtor was not present in Court.  The motion to incur debt was subsequently continued to July 2, 2018, and the parties were able to ultimately work out an agreed order on the borrowing from the Debtor's son.

confirmation hearing and prepared new projections.  Unfortunately, the projections filed with the Court in preparation for the July 25, 2018 confirmation hearing were the wrong set of projections.  This became apparent when the Debtor was on the stand and revealed to counsel and the Court that the projections he was asked to testify about were not the correct ones.  In particular, the projected expenses for fertilizer, lime, seeds and plants were all wrong by a wide margin.  The Debtor projected $48,000 in such expenses through July 2018, and through the hearing date, the Debtor had incurred nothing on those items.  In addition, the projected expenses for January through June 2018 in other areas did not match the Debtor's actual expenses for those months as reflected in monthly operating reports filed with the Court.  The Debtor's actual expenses were in some instances substantially less than his projections, which would in theory work to his benefit in determining net income if his revenue numbers were accurate.  However, given the Court's prior, express admonition that the Debtor needed to come with credible figures to support confirmation, the Debtor's inability to come up with even a "ballpark" accurate expense and revenue projection left the Court with little confidence in the credibility of estimates as to either revenues or expenses going forward.[4]  That the Debtor and his counsel only learned that the wrong projections were filed with the Court once the Debtor was on the stand did not help the situation, leaving the Court also to have serious concerns whether appropriate preparations were made for the confirmation hearing.  In addition, the Debtor was also uncertain at the confirmation hearing how much he owed in past due real estate taxes, which gave the Court further concern about his ability to curtail those arrearages under the terms of his Third Amended Plan.  Confirmation of the Third Amended Plan was denied.

---

[4] The Court uses the colloquial phrase "ballpark" simply to show how far the Debtor's financial projections missed their mark.  As further explained below, "[t]he Court must be persuaded that it is *probable*, not merely possible or hopeful, that the Debtors can actually pay the restructured debt and perform all obligations of the plan."  *In re Rape*, 104 B.R. 741, 749 (W.D.N.C. 1989) (quoting *In re Kloberdanz*, 83 B.R. 767, 773 (Bankr. D. Colo. 1988)).

The Court put the Debtor on terms, giving him one last chance to come up with a confirmable plan.  In addition, the Debtor had to make timely payments to the Chapter 12 Trustee and to Skyline Bank in the interim, which he did.[5]  He was also required to timely file his July, August and September Monthly Operating Reports in advance of the next confirmation hearing, which were filed by the deadlines set by the Court. The Debtor was further ordered to revise his 2018 projections to reflect actual income and expenses.  A Fourth Amended Plan was filed on August 14, 2018, and set for hearing on October 17, 2018.  The Chapter 12 Trustee's objections were again carried over, Farm Credit again objected to the plan due to lack of feasibility and Skyline filed a limited objection to the plan.

### III.    The October 17, 2018 Confirmation Hearing

The Debtor filed revised projections for 2018 using actual numbers off his Monthly Operating Reports filed with the Court.  However, it became apparent from even a cursory review of the arithmetic, his August operating report was off.  The expenses on his operating report for August 2018 were shown to be $20,166.12, but totaling all the expenses in the expense field yielded only $13,964.90.  Despite totaling $20,166.12 in one place on the operating report, the Debtor used expenses totaling $14,572.72 on the same page of the August report, and he reflected $15,517.90 for August on the 2018 expense projection filed in support of his confirmation argument.[6]  (*Compare* ECF No. 176 *with* ECF No. 184-2).  The Debtor gave the Court little reason to have confidence in his ability to accurately track or reflect his actual income and expenses, especially because the Debtor testified he knew in advance of the hearing

---

[5] The Debtor, to his credit, has managed to make every payment ordered by the Court in this case. That is not lost on the Court. The Debtor is a hard-working individual, devoted to his farm and family.  Nevertheless, the Court has to follow the requirements of the Bankruptcy Code in order to approve confirmation, and proof of feasibility going forward has been a continuing challenge in this case, especially given the Debtor's haphazard financial reporting.
[6] The Debtor reflected further borrowings from his son of $3,206.53 as income on his August 2018 operating report. (ECF No. 176).

that the numbers did not add up before the issue was raised in open court.  This was reminiscent of the prior confirmation hearing where the Debtor had two sets of projections, but the wrong set was filed in support of confirmation and not pointed out until he was on the witness stand.

The Debtor's projections for revenue off produce sales at the July confirmation hearing were $53,000 for August and $53,000 for September 2018.  The Debtor's actual numbers were $40,077.04 in August and $38,106.84 in September.  (*Compare* ECF No. 152-3 *with* ECF No. 184-2).  Granted, the Debtor had to deal with Hurricanes Florence and Michael, which affected some of his crops and the North and South Carolina markets for those crops.  As the Debtor testified, "it is hard to sell a pumpkin to someone who doesn't have a house."  Nevertheless, his sales numbers were off substantially from the projections previously advanced. [7]

The issue that arose at the October confirmation hearing that was more problematic than the recordkeeping and sales figures was a question raised by the Court—how much was Farm Credit to be paid under the plan?  It was not clear to the Court based on the terms of the plan, and once the question was asked, it became apparent that no one was in agreement with that fundamental issue despite this being the Debtor's Fourth Amended Plan and third contested confirmation hearing.  Part of the issue was that Farm Credit was granted relief from stay to foreclose collateral pledged by a third party, which would leave a deficiency claim in an undetermined amount that had to be paid as an unsecured claim of the Debtor.  The Chapter 12 Trustee pointed out that even if pre-confirmation payments were added to calculations under the plan, funding of the plan was insufficient to satisfy the terms of the plan—which reflected on page two that given the net equity in the Debtor's real estate, funding is "believed to be sufficient

---

[7] Post-trial briefing reflects the Debtor's projected produce sales numbers for October were $69,000, down from $81,000 as projected at the July hearing.  (*Compare* ECF No. 184-2 *with* ECF No. 152-3). The monthly operating report for October shows actual sales revenue of $36,989.03, a 47% decrease off the October projection.

to pay all unsecured creditors in full." (ECF No. 172, at 2).[8]  The Chapter 12 Trustee assumed under the plan all the Farm Credit debt was being consolidated into a single note, and no separate claims were to be paid out of the unsecured creditor pool.  Such was not the case.  It was apparent that Farm Credit's foreclosure was conducted in August, but the Debtor did not inquire from Farm Credit what its collateral sold for between the time of the foreclosure sale and mid-October confirmation hearing, much less attempt to plan for the potential unsecured claim in the newly filed plan.

The Court took confirmation under advisement, directed Farm Credit to file an amended claim reflecting its deficiency, and ordered the parties to file briefs in support of their submissions in support or opposition to the Debtor's Fourth Amended Plan.[9]  All parties did so, and the Debtor additionally filed a Fifth Amended Plan, which is now set for hearing on January 23, 2019.  There will be no hearing on that plan.

## CONCLUSIONS OF LAW

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the referral made to this Court by Order from the District Court on December 6, 1994, and Rule 3 of the Local Rules of the United States District Court for the Western District of Virginia.  This Court further concludes that this matter is a "core" bankruptcy proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (L), and (O).

---

[8] Debtor's counsel argued at confirmation that "believed" does not mean that the Debtor meant that unsecured creditors would in fact be paid in full.  Given the potential wide variance in payment from in full to what the unsecured creditors would actually get if Farm Credit participated in the unsecured creditor pool, the Court finds counsel's argument disingenuous.
[9] Farm Credit filed an unsecured claim in the amount of $49,344.35 on November 8, 2018.

Case 17-70584   Doc 209   Filed 01/03/19   Entered 01/03/19 15:47:45   Desc Main
Document   Page 9 of 21

## I.    <u>Confirmation of the Debtor's Fourth Amended Plan</u>

The Bankruptcy Code provides Chapter 12 debtors with an enumerated list of

requirements for plan confirmation.  11 U.S.C. § 1225(a).  Relevant to this case, Section 1225(a)

states:

> Except as provided in subsection (b), the court shall confirm a plan if—
> . . .
> (4) the value, as of the effective date of the plan, of property to be distributed under
> the plan on account of each allowed unsecured claim is not less than the amount
> that would be paid on such claim if the estate of the debtor were liquidated under
> chapter 7 of this title on such date;
> (5) with respect to each allowed secured claim provided for by the plan—
>      (A) the holder of such claim has accepted the plan;
>      (B) (i) the plan provides that the holder of such claim retain the lien securing
> such claim; and
>      (ii) the value, as of the effective date of the plan, of property to be distributed
> by the trustee or the debtor under the plan on account of such claim is not less than
> the allowed amount of such claim; or
>      (C) the debtor surrenders the property securing such claim to such holder;
> (6) the debtor will be able to make all payments under the plan and to comply with
> the plan . . . .

*Id.*

The Debtor bears the burden to prove by a preponderance of the evidence that the Court

should confirm a proposed plan.  *In re Pressley*, 502 B.R. 196, 202 (Bankr. D.S.C. 2013).  Thus,

"if any creditor calls into question any element required for confirmation, it is the debtor's

burden to prove compliance therewith."  *In re Keith's Tree Farms*, 519 B.R. 628, 636 (Bankr.

W.D. Va. 2014).  "If the debtor fails to establish any one of the six elements in § 1225, then the

court must deny confirmation of the plan."  *In re Rice*, 357 B.R. 514, 518 (B.A.P. 8th Cir. 2006).

In their briefs, the Trustee and Farm Credit raise several issues with the Debtor's Fourth

Amended Plan.[10]  Farm Credit argues that the Fourth Amended Plan is not feasible and will not

---

[10] Skyline originally filed a limited objection to confirmation of the Debtor's Fourth Amended Plan, but noted at the
hearing that the Debtor had agreed to language in any subsequent confirmation order that would resolve its
objection.  Skyline did not put on any evidence at the hearing and did not file a supplemental memorandum.

provide for payment on its secured claims as required by 11 U.S.C. §§ 1222 and 1225(a)(5).  The

Trustee further notes that the plan is underfunded, such that unsecured creditors will not receive

the dividend the plan proposes.  On the other hand, the Trustee appears to support confirmation

of the Debtor's Fifth Amended Plan.  Similarly, rather than arguing for confirmation of the

Fourth Amended Plan, the Debtor focuses on confirmation of the Fifth Amended Plan, filed

November 27, 2018.  (ECF No. 199.)

### A.   *The Fourth Amended Plan is Not Feasible*

When the Debtor first filed a plan in this case, the Trustee, Farm Credit, and

Skyline all cast doubt on the Debtor's ability to propose a feasible plan.  (*See* Supp. to

Trustee's Report, ECF No. 38-1, at 2 (observing that the Debtor's original schedules and

2016 tax return "fail to demonstrate the financial projections for the farming operation");

Obj. of Skyline, ECF No. 41, at 1 (objecting based on the Debtor's inability to produce

financial records); Farm Credit's Memo. in Support of Obj., ECF No. 202, at 9–13.)

Although Skyline and the Trustee have not expressly renewed their objections based on

feasibility, the Court nonetheless has the same concern over whether the Debtor can meet

this requirement.[11]

Section 1225(a)(6) requires Chapter 12 debtors to "be able to make all payments

under the plan and to comply with the plan."  11 U.S.C. § 1225(a)(6).  Although courts

have recognized that feasibility is a difficult requirement to prove in Chapter 12, "[i]t is

not necessary for debtors to 'guarantee the ultimate success of their plan, but only to

provide a reasonable assurance that the plan can be effectuated.'"  *In re Wise*, No. 12-

07535-dd, 2013 WL 2421984, at *3 (Bankr. D.S.C. May 31, 2013) (alterations in

---

[11] Skyline has worked out a payment arrangement with the Debtor and not since pursued its feasibility objection.

original) (quoting *In re Howard*, 212 B.R. 864, 879 (Bankr. E.D. Tenn. 1997)).

Nonetheless, "[t]he Court must be persuaded that it is *probable*, not merely possible or

hopeful, that the Debtors can actually pay the restructured debt and perform all

obligations of the plan." *In re Rape*, 104 B.R. 741, 749 (W.D.N.C. 1989) (quoting *In re*

*Kloberdanz*, 83 B.R. 767, 773 (Bankr. D. Colo. 1988)).

On feasibility, courts within the Fourth Circuit have generally considered "whether the

debtor will be able to comply with the terms of the plan based on the debtor's historical

performance and current condition of the debtor's business." *In re Keith's Tree Farms*, 519 B.R.

at 637. "This determination is made in light of projections of income and expenses . . . . The

evidence . . . comes in part from Debtor's records in the form of tax returns, and is supplemented

by Schedules I and J and by projections based on changes or additions to the historical

operation." *In re Wise*, 2013 WL 2421984, at *3.

Here, the Fourth Amended Plan proposes annual payments totaling $29,500 per year to

the Trustee, approximately $14,207.81 to Farm Credit, $2,887.92 to Skyline, and $8,234.15 to

FSA. (ECF No. 172, at 2–4.) Additionally, the Debtor proposes to pay part of the Carroll

County Treasurer's secured claim of $36,086.32 by December 2021, with the balance to be paid

by 2024, and pay an additional $3,000 each year toward his remaining Carroll County delinquent

tax liability. Adding the annual payments above, the Debtor is obligated to minimum annual

payments of almost $58,000.00.[12] Seven years after confirmation, the Fourth Amended Plan also

provides for balloon payments to Farm Credit, FSA, and Skyline, paying the remainder of those

claims in full.

---

[12] The Debtor's ongoing annual real estate tax expense of approximately $5,900.00 due to Carroll County is factored
into his annual expense projections. These payments are due each December.

In support of his ability to comply with these plan payments, the Debtor has submitted several cash flow projections and monthly revenue and expense reports since filing bankruptcy. Over time, the Debtor has amended his projections to reflect actual expenses and revenue, decreasing expenses to about 67.5%[13] of the original projection, and ultimately receiving less revenue than expected.  To illustrate this, the Court finds it helpful to compare the projections submitted for the May 2018 confirmation hearing (ECF No. 123-3) and the latest projections filed October 10, 2018 (ECF No. 184-2).  The May projections estimate total expenses of $218,297 and total revenue of $228,010.

The Debtor has now provided actual revenue and expenses for 2018 through the month of October.  Based on these amendments, the Debtor has substantially decreased the costs of his farming operation.  The total expenses for 2018, using actual expenses from January through October and projections for November and December, and not including plan payments, are expected to be only $125,819.60.

The most significant changes from the Debtor's revenue projections were from produce. Although the Debtor originally projected $190,000 in produce revenue (ECF No. 123-3), this amount ultimately decreased to $133,714.91, as the Debtor actually received $3,830 from January to June, $9,712 in July, $40,077.04 in August, $38,106.84 in September, and $36,989.03 in October.  (ECF Nos. 184-2 and 194).  Projections for November and December were $5,000 and $0, respectively.  The Debtor originally projected $81,000 in revenue for October, thus underestimating what he hoped would be the month with the highest revenue by over $44,000.

---

[13] The Debtor's original projection from May 2018 estimated expenses of $186,297 before factoring in plan payments.  His latest projection from October 10, 2018 estimated expenses of $119,342.82.  Later the Debtor filed his October operating report, which had greater expenses than projected.  Adding together his actual expenses through October and his projections for November and December, his 2018 expenses are more accurately stated as $125,819.60, a decrease from the original projection of approximately 32.5%.

Through October, the Debtor's total revenue and expenses for 2018 were $152,508.11 and $106,941.60, respectively, and the Debtor projected an additional $17,860 in revenue and $18,878 in expenses for November and December, leaving just $44,548.51 to make payments to the Trustee and creditors pursuant to the Fourth Amended Plan. With committed minimum annual payments of nearly $58,000, the Debtor is not even close. As a result, the Debtor will have a shortfall even with significantly lower expenses. The Fourth Amended Plan also provides no means or methods for reimbursing his son Ryan for funds advanced in 2018 to fund his farming operation.[14]

When engaging in a feasibility analysis, courts often give Chapter 12 debtors the benefit of the doubt. *See In re Keith's Tree Farms*, 519 B.R. at 637 ("[T]he court should give the Chapter 12 debtor the benefit of the doubt regarding the issue of feasibility when the debtor's plan projections use reasonable data in light of the current economic climate." (quoting *In re Hughes*, No. 06-80219, 2006 WL 2620438, at *3 (Bankr. M.D.N.C. Sept. 11, 2006))).

> [T]he simple fact is that family farming is not an exact science; the success or failure of any one farm is largely dependent upon luck and upon the farmer's skill, resourcefulness, spirit, and grit. No one knows with any real certainty what tomorrow will bring. Many perils face family farmers: Recessions, depressions, droughts, hail storms, and even locusts. In the face of such possible perils, certainly it is not error for a court to consider, along with the hard numbers, the human factor, which may be the deciding factor when fortune—or nature—works against the efforts of the farmer.

*In re Rape*, 104 B.R. at 751. Nonetheless, "[s]incerity, honesty, and willingness are not sufficient to make the plan feasible." *Id.* (quoting *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985)).

---

[14] The Debtor did not rule out future need to borrow additional funds from his son during the life of the Plan.

13

In this case, the Debtor testified that weather played a large role in his decreased profits. Not only did record amounts of rain from Hurricanes Florence and Michael destroy some of the Debtor's crops, but the storms also heavily impacted areas of North and South Carolina where the Debtor sells much of his produce.  If the Court were to give the Debtor the benefit of the doubt and accept the original revenue projection for 2018 ($228,010) (ECF No. 123-3), in comparison to the most favorable expense projection of 2018 ($119,342.83) (ECF No. 184-2), the Debtor's revenue would exceed his expenses by $108,667.17.

However, a review of the Debtor's 2017 operating reports shows that his 2018 revenue did not fall far below the prior year's earnings, thus indicating that the original 2018 projections were overly optimistic.  The Debtor's operating reports for June through December of 2017 list total revenue from produce that year of $165,968.35.  The Court does not have reports from January through May; however, of all the 2018 projections the Debtor has filed, none projected any revenue from produce during those months.  Thus, the Court may reasonably assume that the Debtor received negligible, if any, revenue from produce during those months in 2017.  The Debtor also did not report any revenue from cattle sales in his 2017 reports.  If the Court assumes the Debtor would have earned the same amount from his cattle operation that he projects for 2018 (*see* ECF No. 182-2 (projecting $36,654 in revenue from cattle sales)), the total revenue would have been $202,622.35.  Based on the more optimistic expenses from October, this would result in annual net income of $83,279.52.  However, the Debtor has already demonstrated that his expense projection of $119,342.83 is unsustainable, as his actual expenses increased only a month after filing his October projections.  If the Court assumes expenses similar to the actual expenses reported during 2018, the Debtor will have net income of approximately $76,802.75, and if the Court uses the Debtor's earliest projected expenses of $186,297 before plan payments,

that number falls even lower to $16,325.35.  Thus, in all but the most optimistic scenarios, the Debtor would not have income sufficient to make all his required payments.  Accordingly, the Court finds it improbable that the Debtor will comply with the terms of his plan.

Moreover, these calculations all rely on several significant assumptions—namely, that the Debtor's expenses and revenue will remain relatively steady.  Unfortunately, that appears unlikely as the Debtor has cut expenses to the bone.  For example, the Debtor testified that he has cut expenses by over 35%; however, in doing so, he reduced his cost of purchasing seeds and plants from $23,000 to $5,400.  Although the Debtor testified that he could avoid this cost because he had sufficient seed on hand for 2018, he likely cannot sustain this decrease.  Based on the Debtor's history over the last two years, if his expenses increase in the future, it is unlikely he could sufficiently increase his revenue to cover the added costs.  In fact, the Debtor has testified that he has already borrowed money from his son to pay some expenses.

Most importantly, these calculations assume the accuracy of the Debtor's record keeping and projections.  At several points during the case, the creditors and the Court have each expressed doubt about the veracity of the Debtor's records.  For example, at the May 16, 2018 hearing for the Debtor's Second Amended Plan, the Debtor could not provide an even approximately accurate number of cattle currently in his possession.  He later estimated that he had about one hundred cattle, but the operating report for May listed only seventy-six.

Granted, the Court can now review what the Debtor has provided as his actual revenue and expenses from 2017 and 2018; however, the Court finds it difficult to rely on this documentation, as it contains numerous inaccuracies.  The Debtor conceded at one hearing that the projections filed as an exhibit contained incorrect or outdated figures.  At least one monthly operating report had an obvious mathematical error which the Debtor knew about before he came

to Court but did not mention until the Court spotted it.  Counsel for the Debtor suggested that this supports feasibility because the error was in the Debtor's favor, decreasing expenses by $6,201.22.  To the contrary, the Debtor's inability to perform simple addition or point out errors he knew about in advance casts doubt on the entirety of his record keeping.  As stated in *In re Blake*, feasibility "requires the Court to 'carefully scrutinize the proposed payments in light of projected income and expenses and consider whether they are based upon realistic and objective facts and whether they are capable of being met.'"  585 B.R. 539, 550 (Bankr. S.D. Ill. 2018) (quoting *In re Szudera*, 269 B.R. 837, 842 (Bankr. D.N.D. 2001)).  The Debtor has not met that burden.

Several other inconsistencies further plague the Debtor's case.  For example, he received several loans from his son Ryan in both 2017 and 2018 that he has listed as income on his monthly operating reports.  (*See* June 2017 Report, ECF No. 49 ($41,171.33); July 2017 Report, ECF No. 50 ($6,717.67); July 2018 Report, ECF No. 170 ($11,603.64); Aug. 2018 Report, ECF No. 176 ($3,206.53).)  As of the October 17, 2018 hearing, the Debtor testified that he owed his son approximately $14,000; however, repayment of these loans is not factored into the feasibility calculations above or the Fourth Amended Plan.  Notably, the Debtor's Fourth Amended Plan also does not account for Farm Credit's deficiency claim after selling property owned through an LLC.  In fact, at the hearing, none of the parties knew the amount of the deficiency off hand. Farm Credit has since amended one of its proofs of claim to reflect an unsecured claim of $49,344.35 resulting from that sale.  The Debtor's Fifth Amended Plan attempts to resolve this issue by adding yet another balloon payment, but the Debtor has not established that he can afford the payments currently proposed in his Fourth Amended Plan.

Despite his projections, the Debtor points to his consistent ability to make payments pursuant to the Court's Orders as evidence of feasibility.  It is true that as the case has proceeded for the last year and a half, the Debtor has made his required payments.  However, that the Debtor has remained current on his obligations to date does not necessarily prove his ability to make future payments or to make balloon payments in seven years, either through refinancing or accumulation of funds.[15]  The Debtor has not demonstrated he can comply with the terms of his plan by making annual payments going forward.

The Debtor's uncompelling testimony and mistake-laden projections and operating reports do not persuade the Court that the Debtor can comply with the Fourth Amended Plan. The Debtor has had five opportunities to propose a confirmable plan.  At three consecutive evidentiary hearings, the Debtor's financial projections were deficient.  Although the Debtor's evidence improved in some instances over time, it remains insufficient to meet the burden imposed by Section 1225.   Accordingly, the Court finds that the Debtor's Fourth Amended Plan fails to meet the feasibility requirement of Section 1225(a)(6).

Because the Court finds that the plan is not feasible, it declines to address Farm Credit's alternative argument that the plan improperly treats its secured claims under Sections 1222 and 1225 or the Trustee's argument that the Debtor provided insufficient notice to unsecured creditors based on the language of the plan.

---

[15] The Debtor points to this Court's prior ruling in *In re Terry Properties, LLC*, 569 B.R. 76 (Bankr. W.D. Va. 2017), as providing the road map for confirmation of this Chapter 12 case, including the provision of balloon payments once a track history is developed that can be taken to financial markets at some point in the future.  This case is far different than *Terry Properties* in that the Court was more able to find feasibility with the support of what had been proven to be a steady revenue stream through confirmation along with fairly accurate financial reporting. Thus, *Terry Properties* may well provide an appropriate structure for other Chapter 12 cases.  Given the instability of the Debtor's financial reporting and actual performance versus projected performance in this case, the Court does not have the same level of comfort here.

II.    **Leave to Amend**

Since the Court held a hearing on the Debtor's Fourth Amended Plan, the Debtor has

filed yet another modified plan.  Debtors proceeding in Chapter 12 must file a plan "not later

than 90 days after the order for relief . . . except that the court may extend such period if the need

for an extension is attributable to circumstances for which the debtor should not justly be held

accountable."  11 U.S.C. § 1221.  The Debtor filed his Chapter 12 case over a year and a half ago

on May 3, 2017, and has not yet proposed a confirmable plan.  Because the Debtor has not filed a

confirmable plan within the ninety-day period required by the Bankruptcy Code, he may file

further amended plans only pursuant to leave from this Court.  The Court has not entered any

Order granting further leave to amend the Debtor's Fourth Amended Plan.  Thus, the Court

construes the Fifth Amended Plan as a request for leave to amend, which the Court denies.

In *In re Keith's Tree Farms*, this Court denied leave to amend where the farm "failed to

show any reasonable likelihood of reorganization."  519 B.R. at 643.  It stated that "the Court

does not believe authorizing additional time to file a fourth amended plan is in the best interest of

creditors, as such a plan would suffer from the same infirmities as the Third Amended Plan.

Authorizing leave to amend would be fruitless."  *Id.*

Similarly, in *In re Bentson*, the Bankruptcy Court for the District of Minnesota addressed

a request to extend the time for filing an amended Chapter 12 plan.  There, the court determined

that when debtors seek additional time to file amended plans, courts should consider "when the

first chapter 12 plan was filed, how comprehensive and complete the first plan was, the reasons

for denial of confirmation of the first plan, the likelihood of successful confirmation of a new

plan, and how long an extension is requested."  74 B.R. 56, 58 (Bankr. D. Minn. 1987).  *See also*

*Novak v. DeRosa*, 934 F.2d 401 (2d Cir. 1991) (applying the *Bentson* factors to a request for leave to file an amended Chapter 12 plan).

This Court often provides the benefit of the doubt to debtors who make progress toward developing confirmable plans and will grant leave to amend in appropriate cases.  In this case, however, the Debtor notes, "[t]here is no reason to take additional evidence in the case, because the evidence regarding the debtor's cash flow and his feasibility of making the plan payments, even in light of the increased claims, remains the same."  (Debtor's Memo. in Support of Confirmation, ECF No. 199, at 1.)  The Court has denied confirmation after the Debtor failed to satisfy the feasibility requirement of Section 1225(a).  Importantly, this decision did not result merely from a calculated inability to make payments proposed in the Debtor's Fourth Amended Plan, but also from the Court's questions about the credibility of the Debtor's projections—even where the Debtor estimates an ability to make his payments, those projections appear overly optimistic and so far inaccurate as compared to actual performance.  If the Debtor intends to rely on the same information in support of his Fifth Amended Plan, the likelihood of confirmation is unlikely.  The October 2018 monthly operating report casts further doubt on what were already unpersuasive projections.

The Court believes that, despite the Debtor having made payments to date when put on terms by the Court, this case is fraught with "unreasonable delay, or gross mismanagement, by the debtor that is prejudicial to creditors."  11 U.S.C. § 1208(c)(1).  A similar situation was addressed in *In re Keith's Tree Farms, Inc.*, 519 B.R. 628 (Bankr. W.D. Va. 2014).  There, Chief Judge Connelly stated:

> Unreasonable delay is not defined by the Bankruptcy Code, but according to case law, unreasonable delays can result from failure to timely file documents, failure to file a confirmable plan, failure to file a modified plan, or failure to perform under a confirmed plan.  *In re French*, 139 B.R. 476, 476 (Bankr. D.S.D. 1992).  Similarly,

> gross mismanagement can be demonstrated by failure to provide accurate financial
> information and failure to provide insurance on collateral. *In re Pertuset*, 492 B.R.
> 232, 252 (Bankr. S.D. Ohio 2012), *aff'd,* 485 B.R. 478 (6th Cir. BAP 2012).

*Id.* at 643. The District Court affirmed on appeal stating that "'[b]ankruptcy courts are given a great deal of discretion to say when enough is enough' when it comes to granting or denying the opportunity to amend reorganization plans." *Keith's Tree Farms v. Grayson Nat. Bank*, 535 B.R. 647, 654 (W.D. Va. 2015) (quoting *Matter of Woodbrook Assocs.*, 19 F.3d 312, 322 (7th Cir. 1994)). The District Court also confirmed dismissal was appropriate, observing "[h]ere, the bankruptcy court granted [the lender's] motion to dismiss based on its conclusion that '[t]he inaccurate financial information [provided by the Farm] and the [Farm's] inability to file a confirmable plan[ ] amount to an unreasonable delay that is prejudicial to creditors.' . . . The court finds no abuse of discretion in this conclusion, for the reasons discussed above." *Id.*

The Court made it clear at the July confirmation hearing that the Debtor would be given one final chance to get this case to confirmation. Now, the Debtor asks for yet another bite at the apple. Farm Credit has had to make its point repeatedly that the Debtor's financial projections are unreliable and inaccurate. The Court agrees, and the Fifth Amended Plan does nothing to persuade the Court otherwise. The case will be dismissed.[16]

## **CONCLUSION**

The Court finds that the Debtor's records and projected revenue and expenses are inaccurate and unpersuasive such that they do not demonstrate the Debtor's probable compliance with the plan terms. Accordingly, the Debtor has failed to carry his burden on the feasibility

---

[16] The October 17, 2018 confirmation hearing was also on the Chapter 12 Trustee's Notice to Show Cause. Included in the show cause was a request for dismissal under 11 U.S.C. § 1208 if the Debtor was not current in plan payments or for other grounds as indicated in the show cause. One of those grounds was lack of feasibility. (ECF. Nos. 38, 169). The Debtor's attempt to file yet another plan does change what the Court heard on October 17, 2018.

prong of Section 1225, and confirmation of his Fourth Amended Chapter 12 Plan must be

denied.  Furthermore, the Debtor has failed to state any appropriate grounds for leave to amend

such that the Court will deny such leave and decline to consider the Debtor's Fifth Amended

Plan.  Because the Debtor has had multiple opportunities to present a confirmable plan and has

been unable to do so, the Case will be dismissed.

An appropriate Order will be entered consistent with the terms of this Opinion.

Decided this 3rd day of January, 2019.

UNITED STATES BANKRUPTCY JUDGE